IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WILLIAM B., | ) |
| | ) |
|            Plaintiff, | ) |
| | ) |
|     v. | )   1:22CV86 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
|            Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff William B. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB alleging disability onset in September 2019. (Tr. at 21, 326.)[1] His application was denied initially (Tr. at 228-39, 248-51) and upon reconsideration (Tr. at 240-47, 257-61). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 262-63.) On February 17, 2021, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, at which Plaintiff and an

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #14].

impartial vocational expert testified. (Tr. at 21, 194.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 33), and on December 3, 2021, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 23.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity, affective disorder, anxiety disorder, and post-traumatic stress disorder (PTSD)[.]

(Tr. at 23.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 24-25.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform medium work with the following, additional limitations:

> no complex decision-making; no more than occasional changes in work pace or procedures; no sudden changes in work pace or procedures; sustaining attention in two-hour increments; occasionally interacti[ng] with the public, coworkers, and supervisors; occasionally climbing ramps and stairs; frequently balancing, stooping, kneeling crouching, and never climbing ladders, ropes, or scaffolds.

(Tr. at 25.) At step four of the analysis, the ALJ determined that all of Plaintiff's past relevant work exceeded his RFC. (Tr. at 31.) However, the ALJ found at step five that, given Plaintiff's

5

age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 32-33.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 33.)

Plaintiff now contends that the ALJ failed "to properly consider all of the probative evidence" regarding his mental limitations. (Pl.'s Br. [Doc. #18] at 5.) In particular, Plaintiff argues that, in assessing his RFC, the ALJ erred by failing to perform a function-by-function evaluation of evidence relating to Plaintiff's absenteeism, unscheduled work breaks, and the extent to which he could interact with others, despite persuasive medical opinion evidence suggesting greater limitations. As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (quotation omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 61 Fed. Reg. at 34478. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal brackets, emphases, and quotation omitted).

6

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

Here, as set out above, Plaintiff challenges the ALJ's analysis of evidence relating to Plaintiff's absenteeism, unscheduled work breaks, and the extent to which he could interact with others during the workday. In making this challenge, Plaintiff specifically argues that medical opinion evidence includes limitations in these areas but was not ultimately incorporated in Plaintiff's RFC. Specifically, Plaintiff points to opinion evidence from his primary care provider, Dr. Stephen Hux, who opined that Plaintiff's PTSD-related panic attacks and anger issues "have caused him to miss a lot of work and have created job stress which have made him unemployable." (Tr. at 30, 1454.) The ALJ considered this opinion evidence and also recounted numerous work excuses and FMLA forms provided by Dr. Hux,

which suggested that Plaintiff "would require intermittent absences ranging from two to six days per month." (Tr. at 30, 426, 427, 432, 437, 440, 443, 451, 463, 468.) However, the ALJ further noted that the excuses and forms themselves were "not medical opinions as defined by Agency regulations." (Tr. at 30.)

More importantly, the ALJ explained, at length, his reasons for finding Dr. Hux's overall opinion only "somewhat persuasive," including his determination that "Dr. Hux's opinion is unsupported by his own treatment of [Plaintiff], which reflects conservative management." (Tr. at 30.) In addition, the ALJ found that Dr. Hux's opinion was "somewhat inconsistent with [Plaintiff's] declination of treatment with psychiatrist Pugh and his numerous reports at Daymark Recovery Services that his new medications and group counseling services were providing significant improvement of his symptoms." (Tr. at 30.) In fact, as recounted in the ALJ's decision, the record is replete with evidence demonstrating both Plaintiff's resistance to psychiatric care and his eventual improvement with treatment. (See Tr. at 27-28.) From 2015 to 2019, Plaintiff's only treatment for anxiety and PTSD came in the form of various medications prescribed by Dr. Hux. (Tr. at 27, 529, 552, 565, 568, 586, 592.) Notably, treatment records from this time document Plaintiff's reluctance to establish care with a mental health professional. (Tr. at 523, 581.) Plaintiff was eventually referred to an examining psychiatrist, Dr. Raeford Pugh, in February 2019, but according to treatment notes, Plaintiff "declined to participate in intensive outpatient programming" for PTSD and instead "stated that he would find an individual therapist to work with." (Tr. at 27, 1170.) Dr. Pugh provided the phone number of the Mood Treatment Center, but Plaintiff never established care. (Tr. at 27, 836-37, 840, 1170.) Although Plaintiff was treated in the emergency room at least twice

8

in 2019 for anxiety symptoms and reported problems with anxiety at work, he continued to work until November 2019, and received no specialized mental health treatment until August 2020, when he established care with Daymark Recovery Services. (Tr. at 27, 1460-84.) At that time, he reported having panic attacks several times per week as well as depressive symptoms. (Tr. at 28, 1463, 1473.) Plaintiff began both medication management and group therapy at Daymark, both of which he characterized as helpful. (Tr. at 28, 1475, 1479.) Notably,

> [a]fter beginning medication management (*i.e.*, Sertraline, Prazosin, Trazodone, and Hydroxyzine) in October 2020, [Plaintiff] reported improvement in his anger, anxiety, sleep, nightmares, and panic attacks. In fact, he reported sleeping six-to-eight hours per night; no panic attacks in the last two weeks; and a decrease in nightmares. He reported walking outside every day, playing video games, speaking with his daughter on Skype, and watching television. In October 2020, he was contemporaneously observed having a well-groomed appearance, cooperative and calm attitude, normal speech, normal behavior, logical and goal-directed thoughts, average intelligence, intact memories, and no perceptual disturbances. In fact, the only abnormality was a guarded affect. [Plaintiff] also reported that attending therapy group was helpful. His mental health provider, Marlene Hnilica, PMHNP, continued the claimant on his current medications. She also diagnosed PTSD, panic disorder, and a persistent depressive disorder.
>
> By January 2021, Nurse Practitioner Hnilica [found that Plaintiff] had experienced improvements in nearly all symptoms. She specifically noted [that Plaintiff] had "good relief" of his anxiety and that "many of his PTSD symptoms have decreased." [Plaintiff] continued to report that group therapy was helping, decreased nightmares, improved irritability/anger, and having only residual depressive symptoms. Nurse Practitioner Hnilica increased Sertraline from 75 milligrams to 100 milligrams and advised [Plaintiff] to follow-up monthly. She noted that Wellbutrin may need to be added to improve [Plaintiff's] low motivation and low energy. A contemporaneous exam confirmed entirely normal findings, including the laughing at times, which was an improvement from the only abnormality on the prior exam in October 2020 (i.e., a guarded affect).

(Tr. at 28) (citations omitted) (citing Tr. at 1479, 1481, 1483). Nurse Hnilica also noted that Plaintiff continued to serve as the "primary caretaker of his dementia-affected mother." (Tr.

9

at 28.) These records not only support the ALJ's rationale for finding Dr. Hux's opinion only "somewhat persuasive"; they independently provide evidence that, even if Plaintiff's symptoms initially provided a basis for unscheduled work breaks and/or excessive absences, his subsequent treatment and improvement rendered these limitations unnecessary.[4] The ALJ summarized his reasoning as follows:

> In short, the medical evidence reflects [that Plaintiff] was conservatively managed through his primary care, who noted the claimant was resistant to mental health treatment, and the claimant did not establish specialized care until August 2020 through Daymark Recovery Services, as cited above. Once he began his new medication regimen and counseling services by October [2020], [Plaintiff] reported significant improvement, as cited above. In addition, psychiatric exams and primary care examinations routinely revealed normal mental status findings, less disturbances of mood and/or affect. . . .
>
> . . . [Plaintiff's] reports further erode [Plaintiff's] alleged degree of limitation (SSR 16-3p). For example, [Plaintiff] reported moving his mother into his home and taking care of her because she has dementia. He also reported independently performing his activities of daily living.

(Tr. at 31) (citation omitted). Thus, the decision reflects that the ALJ considered and addressed all of the evidence, including Dr. Hux's opinion evidence, and to the extent Plaintiff relies on the opinions and forms from Dr. Hux to contend that his panic attacks would result in work-preclusive absences and breaks, those opinions and forms were considered and rejected by the

---

[4] Indeed, the medical records cited by the ALJ reflect that in October 2020, Plaintiff reported he had not had a panic attack for two weeks and could "take[] the hydroxyzine which helps when he feels one coming on." (Tr. at 1473-75). In January 2021 he confirmed he was having only "mini panic attacks" once or twice a week when he felt anxiety coming on, but he took the hydroxyzine as needed for this with good relief, with no full-blown panic attacks. (Tr. at 1481-83.) Plaintiff cites to medical records prior to and at the initiation of his mental health treatment, but as noted above, the ALJ found that the record reflected significant improvement once he had begun mental health treatment.

In addition, as noted by Defendant, the record reflects that at the time of the ALJ's decision in April 2021, Plaintiff had not seen Dr. Hux since October 2019, so Dr. Hux's opinions would not have reflected this improvement with mental health treatment in 2020 and early 2021.

ALJ in light of the record reflecting only conservative treatment, Plaintiff's initial refusal to get mental health treatment, and Plaintiff's ultimate improvement once he obtained mental health treatment, as discussed above. (Tr. at 27-28.)[5] Ultimately, the ALJ's decision, as a whole, sufficiently explained his reasons for not adopting Dr. Hux's restrictions as part of the RFC assessment.[6]

Plaintiff's second argument finds greater support in the record, but ultimately fails to provide a basis for remand. As noted above, the ALJ determined that Plaintiff could occasionally interact with coworkers, supervisors, and the public. (Tr. at 25.) Again citing medical opinion evidence, Plaintiff now contends that the opinion evidence supports more stringent social limitations. Notably, the ALJ summarized the State agency psychological consultants' findings as follows:

> [Plaintiff] was limited to simple tasks with "minimal" demands relating to supervisors and coworkers, adapting to routine workplace changes, and never interacting with the general public.

(Tr. at 30) (citing Tr. at 236, 244). This summary reflects the conclusion of the State agency consultant at the initial review. (Tr. at 236) ("Claimant able to sustain the minimal demands associated with relating adequately with supervisors/co-workers. Unable to interact appropriately with the general public."). The summary also generally reflects the conclusion

---

[5] To the extent Plaintiff also cites to the opinion evidence from the consultative examiner, Dr. Gray, the ALJ found that opinion persuasive and similarly noted that Dr. Gray's "opinion regarding [Plaintiff's] prognosis of improvement with therapy is consistent with [Plaintiff's] significant improvement once establishing same and specialized psychiatric care through Daymark Recovery Services in 2020 and 2021." (Tr. at 29-30.)

[6] Instead, in setting the RFC, the ALJ relied on the opinions of the state agency physicians that Plaintiff could sustain work activity with stress-related limitations, and the ALJ included restrictions to no complex decision-making, no more than occasional changes in work pace or procedures, no sudden changes in work pace or procedures, and only occasional interaction with the public, coworkers, and supervisors to address those stress-related limitations. (Tr. at 25, 30-31.)

11

of the State agency consultant at the reconsideration level, although the conclusion on reconsideration did not include any specific limitations regarding the general public. (Tr. at 243) ("[C]laimant retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes."). In any event, regardless of whether the consultants' findings conflict with each other regarding interaction with the public, the initial State agency restriction to no interaction with the general public remains at odds with the ALJ's conclusion that Plaintiff could <u>occasionally</u> interact with the public (<u>compare</u> Tr. at 236, 244), raising some question whether the ALJ overstated Plaintiff's ability to interact with the general public. That discrepancy was not directly addressed by the ALJ. Moreover, on review of the administrative hearing transcript, it does not appear that the ALJ included social restrictions of any kind when questioning the vocational expert. (<u>See</u> Tr. at 220-25.) Fortunately, Plaintiff's attorney and the expert later engaged in the following colloquy:

> Q For those jobs that were mentioned, how much interaction is required between coworkers?
>
> A Let's see, laundry laborer, a few—maybe occasional. Maybe occasional for laundry laborer. So that person is basically in the laundry most of the day. Now food service worker, that person could have contact with the public and other coworkers, a food service worker, that could be frequent contact with coworkers and maybe occasional contact with the public. Now, dishwasher, there could be very little contact with the—no contact with the public and maybe occasional contact with coworkers.

(Tr. at 225.)

Based on the above, the position of food service worker clearly exceeds the social limitations included in the RFC, and the ALJ did not include it as a representative occupation at step five. (Tr. at 32.) The ALJ instead relied on the positions of dishwasher and laundry laborer. (Tr. at 32.) Notably, because the expert failed to define the level of public interaction

12

for the job of laundry laborer, there may be some question whether there is sufficient evidence regarding Plaintiff's ability to perform this job. However, the job of dishwasher was defined by the vocational expert as involving "no contact with the public and maybe occasional contact with coworkers" and, even as a lone job title, is available in substantial numbers in the national economy. (Tr. at 224-25.) Accordingly, the expert's further testimony renders harmless both (1) the ALJ's error in questioning the vocational expert at step five, and (2) the ALJ's error, if any, in overstating Plaintiff's ability to interact with the public when formulating the RFC.

In a related argument, Plaintiff points to the State agency consultants' use of the term "minimal" as evidence that Plaintiff could only interact with co-workers and supervisors "less than" occasionally. (Pl.'s Br. at 9.) However, the State agency consultants' opinions stated, in full, that Plaintiff was "able to sustain the minimal demands associated with relating adequately with supervisors/co-workers," indicating that Plaintiff could, in fact, relate "adequately." (Tr. at 236, 244.) Moreover, the psychological consultant on initial review noted that even with Plaintiff's social interaction limitations, "[o]verall, on a mental basis, [Plainiff] retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes" (Tr. at 233), and the psychological consultant on reconsideration, April Strobel-Nuss, PsyD, specifically explained that Plaintiff could "relate with others well enough for routine workplace purposes" (Tr. at 243), again indicating that the consultants equated "minimal" with at least "occasional" interaction. In short, the ALJ's interpretation of "minimal" is both a plain language reading of the opinions and consistent with the record as a whole. Finally, to the extent that the ALJ failed to communicate any social limitations to the vocational expert, as discussed above, the expert's later clarification that the job of dishwasher

13

only required "maybe occasional contact with coworkers" again renders the ALJ's error harmless at step five of the sequential analysis. (Tr. at 225.)

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #17] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #20] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 21st day of August, 2023.

        /s/ Joi Elizabeth Peake
    United States Magistrate Judge